**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| YAKAR PRIVATE EQUITY, LLC,<br><br>Plaintiff,<br>v.<br><br>WILLIAM S. WEINSTEIN, OAK HARBOR CAPITAL NPL VII, LLC, and OAK HARBOR CAPITAL LLC<br><br>Defendants. | : | C.A. No. ___________<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Yakar Private Equity, LLC ("Plaintiff"), by its undersigned attorneys, complaining of Defendants William S. Weinstein ("Weinstein"), Oak Harbor Capital NPL VII, LLC (the "Fund"), Oak Harbor Capital LLC ("Oak Harbor") (collectively, "Defendants"), alleges as follows:

## NATURE OF ACTION

1. This action arises from self-dealing, lies, and other misconduct perpetrated and orchestrated by Weinstein, who, through a network of shadowy, related entities, has engaged in a fraudulent scheme to enrich himself at Plaintiff's expense.

2. Plaintiff invested $15,000,000 in the Fund, which is solely controlled by Weinstein through his entity Oak Harbor. The Fund invested in title defective and title curative first-line residential mortgage loan assets, which assets were held by special purposes vehicles that were also solely controlled by Weinstein.

3. After making promises of outsized returns, including preferred returns to investors like Plaintiff before Weinstein or his entities saw a single penny, and after years of touting the success of the Fund, in September 2024, Plaintiff received an unexpected letter from Weinstein

announcing that the Fund lacked enough money to repay investors, but promising that investors like Plaintiff could either (i) receive back their unpaid capital plus 2% interest by November 30, 2024 or (ii) receive back their unpaid capital plus 3% interest by January 30, 2025. With no insight into the Fund beyond what Weinstein wanted Plaintiff to see, Plaintiff chose the latter.

4. January 30, 2025 came and went without the Fund making payment to Plaintiff. When Plaintiff questioned Weinstein, Weinstein told Plaintiff that he was trying to sell assets to make payments but that the investors who chose the 2% return option had not yet been paid. Weinstein stated, however, that he hoped to pay those investors soon and eventually be in a position to pay Plaintiff.

5. Plaintiff later discovered that Weinstein was brazenly lying to Plaintiff. In reality, the first set of investors were fully redeemed by December 31, 2024, as reflected in the Fund's audited financials that Plaintiff later received. Moreover, the Fund should have had ample money available to pay Plaintiff through an over $10 million note payable from a Weinstein-controlled entity in favor of one of the Fund's special purpose vehicles, also controlled by Weinstein. However, one year after declaring that such note was fully collectible, Weinstein unilaterally declared that the note was no longer collectible and, instead, wrote it off. This was simply another part of Weinstein's fraud to enrich himself by over $10 million at Plaintiff's expense.

6. Accordingly, Plaintiff brings this action to recover from Defendants' fraud, breaches of fiduciary duty, breach of contract, and other misconduct.

## PARTIES

7. Plaintiff is a Florida limited liability company, whose ultimate beneficial owners are citizens of New York. At all relevant times, Plaintiff maintained a principal place of business in Kearny, New Jersey.

8. Defendant William S. Weinstein is an individual and, upon information and belief, a citizen of Washington state.

9. Defendant Oak Harbor Capital NPL VII, LLC (defined above as the Fund) is, upon information and belief, a Delaware limited liability company, whose ultimate beneficial owner, upon information and belief, is a citizen of Washington state. Upon information and belief, at all relevant times, the Fund maintained a principal place of business in Washington state.

10. Defendant Oak Harbor Capital, LLC is, upon information and belief, a Delaware limited liability company and registered investment advisor with the United States Securities and Exchange Commission, whose ultimate beneficial owner, upon information and belief, is a citizen of Washington state. Upon information and belief, at all relevant times, Oak Harbor maintained a principal place of business in Washington state

## **JURISDICTION AND VENUE**

11. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as well as 28 U.S.C. § 1332, because Plaintiff and Defendants are domiciled in different states, and the amount in controversy exceeds $75,000.

12. Venue is proper pursuant to the parties' September 12, 2019 agreement that sets venue in the United States District Court for the District of Delaware.

## **FACTS**

### **A. Plaintiff is Induced to Invest in the Fund**

13. In or around September 2019, Plaintiff's predecessor, The Eisenreich Family Foundation, received a private placement memorandum for the Fund, dated March 2018 (the "PPM"), which Weinstein caused the Fund to send.

14. The PPM stated that the Fund would make investments in portfolios of title defective and title curative first-line residential mortgage loan assets, through special purpose

vehicles established and managed by Weinstein through his entity Oak Harbor, which would also serve as investment manager for the Fund.

15. After touting the investment acumen and historical success of both Oak Harbor and its principal, Weinstein, the PPM further provided:

(i) the Fund was seeking $250 million in capital;

(ii) the Fund would have a three-year term from the date of the closing of the last investment in the Fund, subject to two successive one-year extensions provided it received the consent of investors holding 66 2/3% of the Fund's committed investment capital;

(iii) the Fund could use leverage to purchase assets, however, any such leverage would not exceed a 1:1 ratio to total commitments;

(iv) Weinstein, personally, would invest an amount equal to at least 1% of total committed capital to the Fund; and

(v) before any other payoffs were made, Fund investors, other than Weinstein, would receive a return equal to 100% of their invested capital plus an 8% preferred return, thereafter, 50% of returns would go to the investors with 50% going to Oak Harbor until Oak Harbor received an amount equal to 20% of the total preferred return amount, and thereafter, any remaining profits would be split with 80% going to the investors and 20% going to Oak Harbor.

16. The PPM went on to provide that the Fund would use the legal services of Weinstein & Rily, P.S., an entity in which Weinstein was the principal owner. The PPM, however, promised that the rates charged by Weinstein's entity to the Fund would be market-based and negotiated without the involvement of Weinstein.

17. After reviewing the PPM, Plaintiff's predecessor invested $6 million in the Fund pursuant to a Subscription Package for Oak Harbor Capital NPL VII, LLC, executed September 12, 2019 (the "Subscription Agreement").

18. Despite the PPM's disclosure that the Fund would use the services of several Weinstein-controlled entities, including the Fund's special purpose vehicles, Plaintiff was reassured by the fact that the Fund, Weinstein, and his entities were bound by law and their

fiduciary obligations to protect Plaintiff and its investments in the Fund, and not engage in any self-dealing, bad faith, or other misconduct.

19. Indeed, the Subscription Agreement expressly provided that any transactions involving Weinstein-controlled entities would be "in compliance with all applicable laws."

20. After making its initial $6 million investment in the Fund, effective as of on or around June 30, 2021, The Eisenreich Family Foundation transferred its rights, title and interest in the Fund to a related entity, Plaintiff Yakar Private Equity, LLC, with the consent of Oak Harbor.

21. Thereafter, Plaintiff made additional investments in the Fund such that the total among that Plaintiff invested reached $15 million.

**B. Weinstein and the Fund Assured Plaintiff that the Fund Was Performing Well and the Fund Would Soon Pay Plaintiff All Amounts Due**

22. Given that Plaintiff lacked any insight into the Fund and had no means of obtaining information beyond what Weinstein wanted it to know, Plaintiff had to rely on the periodic updates and reports it received from the Fund, including audited financials of both the Fund and the special purpose vehicles through which the Fund held its investment, which were managed by Weinstein through Oak Harbor.

23. On or around April 9, 2024, Plaintiff received the 2023 Annual Investor Letter, signed by Weinstein (the "2023 Investor Letter").

24. The 2023 Investor Letter went on for 13 pages to purportedly highlight the Fund's successful performance.

25. Indeed, the 2023 Investor Letter expressly stated that approximately 71% of the loans that the Fund acquired were fully resolved, with a value of over $114 million. The 2023 Investor Letter further confirmed that the Fund intended to "retire investor capital shortly. The objective is to still close the Fund in 2024."

26. In other words, through the 2023 Investor Letter, Weinstein and the Fund assured Plaintiff that it should expect to be paid all amounts due at some time in 2024.

27. Thereafter, on or around May 3, 2024, Plaintiff received the Report of Independent Auditor and Financial Statements for Limosa, LLC (one of the Fund's special purpose vehicles) for the year ending December 31, 2023 (the "2023 Limosa Audited Financials) based on financial statements prepared by Weinstein's entity, Oak Harbor.

28. Notably, the 2023 Limosa Audited Financials disclosed an $11,027,580 "note receivable" among its assets.

29. The 2023 Limosa Audited Financials confirmed that the over $11 million note to Limosa was made by yet another Weinstein-controlled company.

30. Plaintiff was reassured regarding the related party note and conflict of interest because the 2023 Limosa Audited Financials stated that "Management has assessed the collectability of the note receivable and does not consider an allowance necessary."

31. Thus, while Weinstein was obligated to pay Limosa over $11 million from his company, the 2023 Limosa Audited Financials made clear that such note was in good standing and there were no concerns about repayment, such that one of the Fund's special purpose vehicles appeared in good financial condition with funds that would be available to provide distributions to Plaintiff.

## C. <u>Weinstein Lies to Plaintiff in an Attempt to Enrich Himself at Plaintiff's Expense</u>

32. By letter dated September 24, 2024 and signed by Weinstein (the "September 2024 Letter"), the Fund advised Plaintiff that as of September 13, 2024, the "term of the Fund had come to an end" and that the Fund would engage in "an orderly windup of the Fund's business," including distributing final payments to investors.

33. Despite previously touting the success of the Fund, the September 2024 Letter told investors that they would not receive immediate or full payment, purportedly basing it on various boilerplate excuses such as the COVID-19 pandemic and rising interest rates.

34. This blame-shifting by Weinstein, however, directly contradicted prior updates that the Fund had provided to Plaintiff, including (i) a March 31, 2021 "2021 Annual Investor Letter," signed by Weinstein, which claimed that "overall the positive effects [of the volatility created by COVID-19] have outweighed the negative ones"; (ii) a May 20, 2022 "First Quarter 2022 Letter," signed by Weinstein, which stated that the Fund "has not noticed a significant impact" from rising interest rates; and (iii) an April 1, 2024 "2023 Annual Investor Letter," signed by Weinstein, which claimed that rising interest rates actually benefited the Fund:

> High interest rates have disrupted many debt buyers, who have lost access to traditional lines of credit. The result of all these macroeconomic impacts has created a unique opportunity for Oak Harbor Capital in that there are relatively few asset purchasers, prices for these assets have remained stable or dropped, and there remains a healthy market for the sale of Oak Harbor's "starter home" portfolio.

35. The September 2024 Letter went on to present investors with several "Exit Options," including, among others: (A) "Exit Option 1," which provided that an investor would receive payment "equal to your capital contribution, plus a 2% return on unpaid equity" within 30 days of October 31, 2024; and (B) "Exit Option 3" which provided that an investor would receive payment "equal to your capital contribution, plus a 3% return on unpaid equity" within 30 days of December 31, 2024.

36. Given the Fund's consistent praise for its own investment acumen and success, Plaintiff was stunned when it reviewed the various options in the September 2024 Letter. Indeed, a paltry return of 2% or 3% was a far cry from the lavish returns described in the PPM.

37. Faced with what it understood to be no choice, and with no independent insight into the Fund's internal machinations, liquidity, or solvency, Plaintiff executed the "Option Selection"

document provided by the Fund, selected Exit Option 3, and understood that it would receive payment within 30 days of December 31, 2024 (*i.e.*, by January 30, 2025).

38. January 30, 2025, however, came and went without the Fund making any payment to Plaintiff. Rather than providing any explanation or update, Weinstein failed to communicate with Plaintiff at all, forcing Plaintiff to repeatedly chase Weinstein for basic information regarding the status of its investment and the overdue payment.

39. When Plaintiff contacted Weinstein to ascertain the status of the payment, Weinstein responded by email on February 28, 2025 advising that the Fund did not presently have money available to pay Plaintiff and, while Weinstein had hoped that the proceeds from a recent asset sale would "have been sufficient to [pay] off all Option 1 investors in full," it was not. After further prodding by Plaintiff, by email dated March 19, 2025, Weinstein attempted to blame Goldman Sachs for not providing information and made promises of payment in the coming weeks.

40. At the time, Plaintiff had no way of knowing that Weinstein was brazenly lying to Plaintiff to keep Plaintiff from taking action regarding its interest in the Fund while Weinstein caused the Fund to continue to default on its obligations and enjoy the benefits of holding Plaintiff's money, while also staving off the inevitable lawsuit and public damage to Weinstein's reputation.

41. Plaintiff, however, later obtained the Report of Independent Auditor and Financial Statements for Oak Harbor Capital NPL VII, LLC, for the year ending December 31, 2024, which clearly stated that ***all investors who chose Exit Option 1 were fully redeemed as of December 31, 2024***, thereby establishing that Weinstein's statements to Plaintiff were knowingly false when made.

42. Weinstein's fraudulent scheme further unraveled when Plaintiff reviewed the Report of Independent Auditor and Financial Statements for Limosa, LLC for the year ending December 31, 2024 (the "2024 Limosa Audited Financials").

43. In a complete reversal from the assurances in the 2023 Limosa Audited Financials, and now that the Fund was in liquidation and Plaintiff was due its money, the 2024 Limosa Audited Financials abruptly reversed course and conveniently rebranded the note as "uncollectible" without any disclosure as to how that decision was reached or any description of the financial condition of the Weinstein entity that was obligated under the note.

44. Put otherwise, now that it was time for Weinstein's entity to finally pay over $10 million to Limosa, which funds could be used to repay Plaintiff, Weinstein unilaterally decided to claim that those funds were simply uncollectible so that he could keep the over $10 million, while leaving Plaintiff holding the bag. It was now obvious that Weinstein's attempts in September 2024 to blame the Fund's inability to repay Plaintiff on COVID-19 and rising interest rates was a fraud designed to placate Plaintiff while Weinstein maintained his grip on over $10 million to which he had no lawful right.

45. To date, and despite multiple demands for payment, Plaintiff has not been fully repaid.

## FIRST CLAIM FOR RELIEF
**(Securities Fraud Against Defendants)**

46. Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

47. Plaintiff's investment in the Fund constitutes a security for the purposes of the Securities Exchange Act of 1934 (the "Exchange Act").

48. Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

49. The Securities and Exchange Commission has promulgated such a regulation, making it illegal to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 CFR § 240.10b–5(b).

50. As set forth above, Weinstein, on behalf of himself, the Fund, and Oak Harbor, made numerous material misrepresentations and omissions of information peculiarly within Defendants' knowledge to Plaintiff.

51. As set forth above, Defendants knew their misrepresentations were false and that their omissions were material.

52. As a direct and proximate result of Defendants' material misrepresentations and omissions, Plaintiff has suffered damages in an amount to determined at trial, but no less than $5,864,668.74 plus costs, interest, expenses and attorneys' fees.

**SECOND CLAIM FOR RELIEF**
**(Fraud Against Defendants)**

53. Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

54. As set forth above, Defendants made fraudulent statements to Plaintiff, including by omitting material information peculiarly within Defendants' knowledge.

55. As set forth above, Defendants knew that their misrepresentations were false and that their omissions were material.

56. As set forth above, Plaintiff reasonably relied upon Defendants' misrepresentations and omissions, especially considering that Plaintiff lacked any insight into the inner workings and true financial condition of Defendants and their related parties, and given the lack of such insight by Plaintiff and the fiduciary duties that Defendants owed to Plaintiff, Defendants knew that Plaintiff would rely upon Defendants' representations.

57. Plaintiff was unaware of, and could not have discovered through the exercise of reasonable diligence, Defendants' materially false and misleading representations and omissions.

58. As a direct and proximate result of Defendants' material misrepresentations and omissions, Plaintiff has suffered damages in an amount to determined at trial, but no less than $5,864,668.74 plus costs, interest, expenses and attorneys' fees.

## <u>THIRD CLAIM FOR RELIEF</u>
## (Aiding and Abetting Fraud Against Weinstein and Oak Harbor)

59. Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

60. In the alternative that the Court does not find that Weinstein and Oak Harbor directly defrauded Plaintiff, as set forth above, Weinstein and Oak Harbor aided and abetted the fraud committed by the Fund.

61. As set forth above, by virtue of their positions and relationship to the Fund, Weinstein and Oak Harbor had actual knowledge of the fraud.

62. As set forth above, Weinstein and Oak Harbor knowingly participated in the fraud and provided substantial assistance, including by knowingly providing false and fraudulent

documents and communications to Plaintiff with the knowledge that Plaintiff would rely upon such fraudulent documents and communications.

63. As a direct and proximate result of Weinstein and Oak Harbor's misconduct, Plaintiff has suffered damages in an amount to determined at trial, but no less than $5,864,668.74 plus costs, interest, expenses and attorneys' fees.

## FOURTH CLAIM FOR RELIEF
**(Breach of Fiduciary Duties Against Defendants)**

64. Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

65. As set forth above, the Fund, Oak Harbor, as investment manager, and Weinstein, as the principal and control person of Oak Harbor and the Fund, owe Plaintiff fiduciary duties.

66. As set forth above, Defendants through their misconduct and self-dealing have harmed Plaintiff, and Defendants failed to act in good faith and with the requisite level of care.

67. The conduct of Defendants was and continues to be arbitrary, capricious, willful and malicious.

68. As a direct and proximate result of Defendants' misconduct, Plaintiff has suffered damages in an amount to determined at trial, but no less than $5,864,668.74 plus costs, interest, expenses and attorneys' fees.

## FIFTH CLAIM FOR RELIEF
**(Breach of Contract Against the Fund)**

69. Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

70. As set forth above, Plaintiff and the Fund entered into a valid and binding contract.

71. As set forth above, Plaintiff fully performed under the parties' contract.

72. As set forth above, the Fund breached the parties' contract.

73. As a direct and proximate result of the Fund's breach of contract, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $5,864,668.74 plus costs, interest, expenses and attorneys' fees.

**SIXTH CLAIM FOR RELIEF**
**(Unjust Enrichment Against Defendants)**

74. Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

75. As set forth above, Defendants have been unjustly enriched at Plaintiff's expense.

76. In the alternative that the Court does not find that a contract existed between Plaintiff and any of the Defendants, the Court should find that principles of equity and good conscience do not permit Defendants to retain the, at least, $5,864,668.74 that Defendants owe to Plaintiff.

77. As a direct and proximate result of Defendants' misconduct, Plaintiff has suffered damages in an amount to determined at trial, but no less than $5,864,668.74 plus costs, interest, expenses and attorneys' fees.

**JURY DEMAND**

Plaintiff demands a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff hereby requests that the Court grant the following relief:

a. Judgment in Plaintiff's favor and against Defendants, jointly and severally, in an amount to be determined at trial, but in no event less than $5,864,668.74, plus pre-judgment interest;

b. Plaintiff's costs and disbursements incurred in this suit;

c. Plaintiff's attorneys' fees to the full extent permitted by law; and

d. Any such other and further relief as the Court may deem just and proper.

Dated: April 27, 2026

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ Joseph B. Cicero*

Joseph B. Cicero (#4388)
Gregory E. Stuhlman (#4765)
Mariksa Suparman (#7271)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
(302) 295-0191
cicero@chipmanbrown.com
stuhlman@chipmanbrown.com
suparman@chipmanbrown.com

*Attorneys for Plaintiff*

OF COUNSEL:

Terrence A. Oved
Glen Lenihan
Kendall Coniaris
OVED & OVED LLP
401 Greenwich Street
New York, New York 10013
(212) 226-2700
terry@oved.com
glenihan@oved.com
kconiaris@oved.com